IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:24-CV-449-D

| | | |
|---|---|---|
| MICHJEFF, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| FCX GLOBAL, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

On May 29, 2024, MichJeff, LLC ("MichJeff") and Jeffrey Allan Mueller ("Mueller") (collectively, "plaintiffs") filed a verified complaint and application for temporary restraining order ("TRO") and a preliminary injunction against FCX Global, Inc. ("FCX"), Jarett Reinhartz ("Reinhartz") (collectively, "FCX defendants"), Ten Toes Down, Inc. ("TTD"), Micah Gabriel Katz ("Katz"), and Nate Jones ("Jones") (collectively, "TTD defendants") (all collectively "defendants") in New Hanover County Superior Court [D.E. 1-1]. Plaintiffs assert claims for (1) breach of contract, (2) misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. §§ 66-152, et seq., (3) unjust enrichment, (4) unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. §§ 75-1, et seq., (5) constructive fraud, and (6) civil conspiracy. See [D.E. 1-1] ¶¶ 78–118. On May 30, 2024, defendants removed the action to this court [D.E. 1].

On June 7, 2024, plaintiffs moved for a TRO, expedited discovery, and a preliminary injunction [D.E. 16] and filed a memorandum in support [D.E. 16-1]. On June 21, 2024, defendants responded in opposition [D.E. 20, 25]. On June 28, 2024, plaintiffs replied [D.E. 28].

As explained below, the court denies plaintiffs' motion for a TRO, expedited discovery, and a preliminary injunction.

I.

In 1959, Mueller's father founded Mueller Sports Medicine ("MSM"). See Compl. [D.E. 1-1] ¶ 13. MSM manufactures and distributes sports medicine products. See id. Mueller began working part-time for MSM when he was 11 years old, began working full-time for MSM when he was 17 years old, and has worked "at every level of MSM" for approximately 50 years. Id. at ¶ 14. While working at MSM, Mueller developed "extensive and deep industry relationships" with "manufacturers, distributors, wholesalers, raw material processors, retailers, sales representatives, medical facilities, professional sports teams, athletic trainers, and sports training organizations" (Mueller's "relationship capital"). Id. at ¶ 15. Through his work at MSM, Mueller also "gained and developed extensive sports medicine industry knowledge, expertise, and skills in the areas of product development, manufacturing, distribution, marketing, pricing, sales, and fulfillment" (Mueller's "industry knowledge"). Id. at ¶ 20; see id. at ¶ 21. In 2016, Mueller semi-retired from MSM and created MichJeff to provide consulting services in the sports medicine industry. See id. at ¶ 26.

FCX sells and distributes "Insite," a shoe insole product. See id. at ¶ 30. Reinhartz is President or Managing Director of FCX. See id. at ¶ 4. Reinhartz has a background in podiatry and pedorthics. See id. at ¶ 28. On June 22, 2016, Mueller met Reinhartz at a trade exposition and learned about the Insite insole. See id. at ¶¶ 34–37. In 2017, FCX hired Mueller and MichJeff "to help FCX develop and implement processes and strategies to refine Insite insoles as a product, grow its sales, increase its profitability, and provide similar consulting." Id. at ¶ 43; see id. at ¶¶ 38–41, 43. Plaintiffs entered an independent contractor agreement and a confidential disclosure

2

agreement ("CDA") with FCX. See id. at ¶¶ 43–46. While working with FCX, plaintiffs "conveyed Industry Knowledge and Relationship Capital to [FCX] through [Reinhartz]." Id. at ¶ 51.

In 2020, plaintiffs were introduced to Katz, Jones, and TTD. See id. at ¶ 52. At that time, TTD was "a current or soon-to-be licensee of FCX's Insite" to create a separate product, Move Insoles. Id. at ¶ 53. In 2022, plaintiffs and TTD "entered into an agreement" in which plaintiffs agreed to "provide a similar, but broader suite of services to TTD" than what plaintiffs provided to FCX. Id. at ¶ 55. TTD agreed "not to circumvent" plaintiffs "by communicating or conducting business with" plaintiffs' clients. Id. at ¶ 57. While working with TTD, plaintiffs conveyed their industry knowledge and relationship capital to TTD through Katz and Jones. See id. at ¶¶ 62–65.

On March 20, 2024, FCX issued a notice of termination to plaintiffs with a termination date of April 19, 2024. See id. at ¶ 49. On April 19, 2024, FCX stopped paying plaintiffs. See id. at ¶ 50. In April 2024, Katz told plaintiffs that TTD would not renew its contract with plaintiffs and "intended to halt all compensation." Id. at ¶ 61. Plaintiffs allege that FCX and TTD have continued to use and benefit from plaintiffs' industry knowledge and relationship capital without paying plaintiffs. See id. at ¶¶ 66–77.

II.

The court has considered plaintiffs' motion for a TRO under the governing standard. See, e.g., Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc); Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reissued in relevant part, 607 F.3d 355 (4th Cir. 2010) (per curiam). A motion for a TRO follows the same standard applicable to a motion for a preliminary injunction. See U.S. Dep't of Lab. v. Wolf Run Mining

3

Co., 452 F.3d 275, 281 n.1 (4th Cir. 2006). MichJeff and Mueller must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. See Winter, 555 U.S. at 20. A TRO "is an extraordinary remedy never awarded as of right." Id. at 24; see Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017); Shibumi Shade, Inc. v. Beach Shade LLC, No. 5:21-CV-256, 2022 WL 390839, at *3 (E.D.N.C. Feb, 8, 2022) (unpublished) appeal dismissed, No. 2023-1051, 2022 WL 17661183 (Fed. Cir. Dec. 14, 2022) (unpublished); Mitchell v. N.C. Div. of Emp. Sec., 76 F. Supp. 3d 620, 628 (E.D.N.C. 2014), aff'd, 599 F. App'x 517 (4th Cir. 2015) (per curiam) (unpublished).

Plaintiffs seek relief under North Carolina law. Accordingly, the court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[1] In doing so, a federal court "should not create or expand [a] [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (cleaned up); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a state would address an issue, this court must

---

[1] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

4

"follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

Plaintiffs argue that they are likely to succeed on the merits of their trade secrets misappropriation claim under the TSPA. See [D.E. 16-1] 13–14; see also Compl. ¶¶ 85–90. Defendants respond that the TSPA does not apply to plaintiffs' claim, and plaintiffs fail to identify any trade secrets. See [D.E. 20] 11–16; [D.E. 25] 12–14. Plaintiffs reply that the TSPA applies because plaintiffs suffered injury in North Carolina, and that they have sufficiently alleged protectable trade secrets. See [D.E. 28] 3–6.

North Carolina uses the lex loci delicti test when assessing TSPA misappropriation claims. See Domtar AI Inc. v. J.D. Irving, Ltd., 43 F. Supp. 3d 635, 641 (E.D.N.C. 2014); SciGrip, Inc. v. Osae, 373 N.C. 409, 420–21, 838 S.E.2d 334, 343–44 (2020). Under the lex loci test, courts apply "the substantive law of the state where the injury or harm was sustained or suffered, which is, ordinarily, the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place." SciGrip, 373 N.C. at 420, 838 S.E.2d at 343 (quotation omitted); see Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 695, 698 S.E.2d 719, 724 (2010). Thus, where a defendant allegedly misappropriates and uses trade secrets outside of North Carolina, the TSPA does not apply. See, e.g., Domtar AI Inc., 43 F. Supp. 3d at 641; SciGrip, 373 N.C. at 424, 838 S.E.2d at 346; Elior, Inc. v. Thomas, No. 23 CVS 12616, 2024 WL 1739861, at *17 (N.C. Super. Ct. Apr. 22, 2024) (unpublished).

As for the FCX defendants,[2] FCX and Reinhartz reside in Florida. See id. at ¶¶ 3–4. Plaintiffs allege that defendants misappropriate plaintiffs' trade secrets by "proceed[ing] with

---

[2] Plaintiffs argue that the FCX defendants waived this argument. See [D.E. 28] 3 n.1. The FCX defendants, however, incorporated this argument by reference. See [D.E. 25] 12 n.9; see also [D.E. 27] 9 n.7.

5

business as usual." Id. at ¶ 75. Plaintiffs "fail[] to allege any fact that would support an inference that the last act giving rise to the injury occurred anywhere other than in" Florida. Elior, Inc., 2024 WL 1739861, at *17. Thus, the TSPA does not apply to plaintiffs' claims against the FCX defendants. See, e.g., id.; Domtar AI Inc., 43 F. Supp. 3d at 641; SciGrip, 373 N.C. at 424, 838 S.E.2d at 346. Accordingly, plaintiffs fail to show a likelihood of success on the merits of their TSPA claim against the FCX defendants.

As for the TTD defendants, TTD resides in Delaware and Georgia. See id. at ¶ 5. Katz resides in Georgia. See id. at ¶ 6. Jones resides in California. See id. at ¶ 7. Mueller, however, expanded TTD's business to Carolina Home Medical. See [D.E. 20-1] ¶ 7. Plaintiffs seek injunctive relief prohibiting defendants from doing business with Carolina Home Medical and argue that Mueller's relationship with Carolina Home Medical constitutes part of plaintiffs' trade secrets. See [D.E. 16] 3–4. Carolina Home Medical is incorporated in North Carolina and has its principal place of business in North Carolina. See Search, https://www.sosnc.gov/online_services/search/by_title/_Business_Registration (search "Carolina Home Medical" in "Searching For" field) (last visited July 2, 2024). Accordingly, based on the limited record, the TTD defendants' use of the alleged "trade secret occurred" in North Carolina. Domtar AI Inc., 43 F. Supp. 3d at 641. Thus, the TSPA applies to plaintiffs' trade secrets misappropriation claim against the TTD defendants.

To state a trade secret misappropriation claim, a plaintiff must plausibly allege "that a defendant: (1) knows or should have known of the trade secret; and (2) has had specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." GE Betz, Inc. v. Conrad, 231 N.C. App. 214, 230, 752 S.E.2d 634, 649 (2013) (cleaned up); see N.C. Gen. Stat. § 66-155. As for the

6

second element, "North Carolina courts generally . . . require evidence that the defendant actually acquired or used trade secrets." RLM Commc'ns, Inc. v. Tuschen, 831 F.3d 190, 200–01 (4th Cir. 2016) (collecting cases).

A "trade secret" is "business or technical information, including . . . a formula, pattern, program, device, compilation of information, method, technique, or process" that "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development" by "persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3). Courts consider six factors to determine whether information constitutes a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 278, 827 S.E.2d 458, 473 (2019) (cleaned up); see Progress Solar Sols. v. Fire Prot., Inc., No. 5:17-CV-152, 2020 WL 5732621, at *8 (E.D.N.C. Sept. 24, 2020) (unpublished) (collecting cases); Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc., 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).

"Courts have refused to protect customer names and addresses or personal relationships with customers as 'trade secrets.'" Philips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009); see, e.g., 360 Mortg. Grp., LLC v. Stonegate Mortg. Corp., No. 5:14-CV-310, 2016 WL 4943933, at *5 (E.D.N.C. Sept. 14, 2016) (unpublished); Eli Rsch., LLC v. Must Have Info Inc., No. 2:13-CV-695, 2015 WL 5895460, at *8–9 (M.D. Fla. Oct. 6, 2015) (unpublished) (applying North Carolina law); Asheboro Paper & Packaging, Inc. v. Dickinson, 599 F. Supp. 2d

7

664, 677 (M.D.N.C. 2009) ("Under North Carolina law, customer information maintained in the memory of a departing employee is not a trade secret."); UBS Painewebber, Inc. v. Aiken, 197 F. Supp. 2d 436, 447–48 (W.D.N.C. 2002); Combs & Assocs., Inc. v. Kennedy, 147 N.C. App. 362, 370, 555 S.E.2d 634, 640 (2001); Novacare Orthotics & Prosthetics E., Inc. v. Speelman, 137 N.C. App. 471, 477–78, 528 S.E.2d 918, 922 (2000). Moreover, "matters of public knowledge or of general knowledge in an industry or information that is freely available throughout an industry cannot be claimed as a trade secret." SCR-Tech LLC v. Evonik Energy Servs. LLC, No. 08 CVS 16632, 2011 WL 3209080, at *11 (N.C. Super. Ct. July 22, 2011) (unpublished) (cleaned up); see, e.g., Found. Bldg. Materials, LLC v. Conking & Calabrese, Co., No. 23 CVS 9285, 2023 WL 4561583, at *12 (N.C. Super. Ct. July 7, 2023) (unpublished) ("General descriptions of information that are not unique to [the plaintiff] are insufficient to identify a trade secret."); Aym Techs., LLC v. Rodgers, No. 16-CVS-21788, 2019 WL 5257950, at *7 (N.C. Super. Ct. Oct. 16, 2019) (unpublished). Furthermore, "[a]cquiring and using . . . knowledge and experience" gained during employment "does not constitute misappropriation of trade secrets under North Carolina law." RLM Commc'ns, Inc. v. Tuschen, 66 F. Supp. 3d 681, 696–97 (E.D.N.C. 2014) (collecting cases), aff'd, 831 F.3d 190 (4th Cir. 2016).

Plaintiffs allege that Mueller's industry knowledge and relationship capital are trade secrets. See Compl. ¶¶ 85–90. Mueller's relationship capital consists of "industry relationships with dozens of manufacturers, distributors, wholesalers, raw material processors, retailers, sales representatives, medical facilities, professional sports teams, athletic trainers, sports training organizations[,] and the like." Id. at ¶ 15. Such relationships are not trade secrets under North Carolina law. See, e.g., Hope, 631 F. Supp. 2d at 721; Dickinson, 599 F. Supp. 2d at 677; Duo-Fast Carolinas, Inc. v. Scott's Hill Hardware & Supply Co., No. 16 CVS 9343, 2018 WL 264607,

8

at *5–7 (N.C. Super. Ct. Jan. 2, 2018) (unpublished) (collecting cases); Amerigas Propane, L.P. v. Coffey, No. 14 CVS 376, 2015 WL 6093207, at *12 (N.C. Super. Ct. Oct. 15, 2015) (unpublished). Accordingly, plaintiffs are not likely to succeed on their TSPA claims concerning Mueller's relationship capital.

Mueller's industry knowledge consists of, inter alia, identities of distributors and retailers, the internal structures of distributors and retailers, and the personal contact information of the CEO of a distributor. See id. at ¶ 21. Plaintiffs fail to show that their industry knowledge is not "readily ascertainable through independent development." N.C. Gen. Stat. § 66-152(3). Instead, Mueller's relevant industry knowledge "would have been easily accessible to defendant[s] through a local telephone book," Speelman, 137 N.C. App. at 478, 528 S.E.2d at 922, or "trade show and seminar attendance lists." Combs & Assocs., 147 N.C. App. at 370, 555 S.E.2d at 640. Accordingly, plaintiffs are not likely to succeed on their TSPA claims concerning Mueller's industry knowledge. See, e.g., Tuschen, 66 F. Supp. 3d at 695–700.

In opposition to this conclusion, plaintiffs contend that "trade secrets can include customer pricing lists, cost information, confidential customer lists, and pricing and bidding formulas." [D.E. 16-1] 14; see [D.E. 28] 4–6; see, e.g., Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., 174 N.C. App. 49, 53, 620 S.E.2d 222, 226 (2005); Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc., 160 N.C. App. 520, 525, 586 S.E.2d 507, 511 (2003). Plaintiffs do not show that their purported trade secrets include confidential information that suffices to convert bare customer lists into trade secrets. See Speelman, 137 N.C. App. at 478, 528 S.E.2d at 922; cf. 360 Mortg. Grp., 2016 WL 4943933, at *5; Byrd's Lawn & Landscaping, Inc. v. Smith, 142 N.C. App. 371, 375–76, 542 S.E.2d 689, 692 (2001); Glover Constr. Co. v. Sequoia Servs., LLC, No. 18 CVS 1900, 2020 WL 3393065, at *16 (N.C. Super. Ct. June 18, 2020) (unpublished). Instead, plaintiffs

9

merely had better contacts in the sports medicine industry than defendants, which defendants sought to help their start-up companies. See Compl. ¶¶ 15, 21, 26, 43, 55; [D.E. 16-1] 1. Accordingly, plaintiffs are not likely to succeed on the merits of their TSPA claims. See, e.g., Dickinson, 599 F. Supp. 2d at 677–78; Krawiec v. Manly, 370 N.C. 602, 611–12, 811 S.E.2d 542, 549 (2018).

Plaintiffs also argue that their trade secrets include various sales strategies and knowing how to adhere to the internal operating procedures of various sports medicine distributors, retailers, and customers. See [D.E. 28] 5; Compl. ¶¶ 15, 20, 21. As for plaintiffs' alleged sales strategies, plaintiffs "provide[] no further detail about these ideas, concepts, strategies, and tactics sufficient to put defendants on notice as to the precise information allegedly misappropriated." Krawiec, 370 N.C. at 611, 811 S.E.2d at 549. Accordingly, plaintiffs fail to show a likelihood of success on the merits concerning alleged misappropriation of plaintiffs' sales strategies. See id. at 611–12, 811 S.E.2d at 549.

As for plaintiffs' alleged knowledge of distributors', retailers', and customers' operating procedures, plaintiffs fail to demonstrate that such knowledge is not "readily ascertainable" from those companies in the ordinary course of business. N.C. Gen. Stat. § 66-152(3). Accordingly, plaintiffs fail to demonstrate a likelihood of success on the merits concerning alleged misappropriation of plaintiffs' knowledge of other companies' internal operating procedures. See, e.g., Safety Test & Equip. Co. v. Am. Safety Util. Corp., No. 13 CVS 1037, 2015 WL 1880769, at *16–17 (N.C. Super. Ct. Apr. 23, 2015) (unpublished); Edgewater Servs., Inc. v. Epic Logistics, Inc., No. 05 CVS 1971, 2009 WL 2456868, at *5 (N.C. Super. Ct. Aug. 11, 2009) (unpublished), aff'd, 217 N.C. App. 399, 720 S.E.2d 30, 2011 WL 6035918 (2011) (unpublished table decision).

10

Alternatively, plaintiffs do not connect their sales strategies and knowledge of other companies' internal procedures to defendants' alleged misappropriation. Instead, plaintiffs allege and argue that defendants misappropriate plaintiffs' trade secrets by continuing to do business with some of plaintiffs' contacts. See Compl. ¶ 88; [D.E. 16] 3–4; [D.E. 16-1] 2 ("[Defendants] continue to use the distributors, vendors, and other contacts to whom [p]laintiffs introduced them."). Plaintiffs do not show or argue that defendants continue to use plaintiffs' sales strategies or knowledge of other companies' internal operating procedures. Tellingly, plaintiffs do not seek injunctive relief to stop defendants from using plaintiffs' alleged sales strategies or knowledge of other companies' internal operating procedures. Cf. [D.E. 16] 3–4. Accordingly, plaintiffs fail to demonstrate a likelihood of success on the merits of their trade secrets claims. See, e.g., Speelman, 137 N.C. App. at 477–78, 528 S.E.2d at 922.

In plaintiffs' reply, plaintiffs also contend that they seek injunctive relief based on their breach of contract claim against TTD. See [D.E. 28] 6; Compl. ¶¶ 78–84. Plaintiffs, however, only referenced their TSPA claims throughout their TRO motion. See [D.E. 16-1] 12–17. Generally, a party cannot raise new arguments in a reply brief. See De Simone v. VSL Pharm., 36 F.4th 518, 531 (4th Cir. 2022); United States v. Ballard, ___ F. Supp. 3d ___, 2023 WL 8946800, at *18 (E.D.N.C. Dec. 27, 2023). Given that defendants could not address this argument, the court enforces this rule.

Alternatively, under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); see Kasparov, Pte Ltd. v. Zacherl, ___ F. Supp. 3d ___, No. 5:22-CV-503, 2024 WL 1494747, at *5 (E.D.N.C. Apr. 5, 2024) (collecting cases). Plaintiffs argue that TTD breached its contracts with plaintiffs by "communicating or conducting

11

business with [p]laintiffs' clients." [D.E. 28] 6 (quotation omitted); see Compl. ¶¶ 57, 79–80. Plaintiffs, however, allege that TTD terminated or did not renew its contracts with plaintiffs. See Compl. ¶¶ 61, 77. Moreover, plaintiffs argue that defendants misappropriated plaintiffs' trade secrets by continuing defendants' relationships with distributors, retailers, and customers absent an agreement with plaintiffs. See [D.E. 16-1] 2 ("With the ending of those agreements, so ended [d]efendants' right to use [p]laintiffs' industry contacts."). Thus, plaintiffs fail to demonstrate "the existence of a valid contract." Poor, 138 N.C. App. at 26, 530 S.E.2d at 843. Accordingly, plaintiffs fail to show a likelihood of success on the merits of their breach of contract claim against TTD. See, e.g., U.S. Tr. Co., N.A. v. Rich, 199 N.C. App. 320, 682 S.E.2d 248, 2009 WL 2501831, at *3–4 (2009) (per curiam) (unpublished table decision).

At this preliminary stage, plaintiffs have not shown a likelihood of success on the merits. Thus, the court need not analyze the remaining three factors under Winter and denies plaintiffs' motion for a TRO and preliminary injunction. See Winter, 555 U.S. at 20; FBA Operating Co. v. ETN Cap., LLC, No. 5:23-CV-505, 2023 WL 6612439, at *5 (E.D.N.C. Oct. 10, 2023) (unpublished).

III.

In sum, the court DENIES plaintiffs' motion for a temporary restraining order, expedited discovery, and a preliminary injunction [D.E. 16].

SO ORDERED. This _2_ day of July, 2024.

JAMES C. DEVER III
United States District Judge

12