IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:24-CV-449-D

MICHJEFF, LLC, et at.,   )
           )
   Plaintiffs,    )
           )
   v.        )   **ORDER**
           )
FCX GLOBAL, INC., et al.,   )
           )
   Defendants.   )

On May 29, 2024, MichJeff, LLC ("MichJeff") and Jeffrey Allan Mueller ("Mueller")
(collectively, "plaintiffs") filed a verified complaint and application for temporary restraining order
("TRO") and a preliminary injunction against FCX Global, Inc. ("FCX"), Jarett Reinhartz
("Reinhartz") (collectively, "FCX defendants"), Ten Toes Down, Inc. ("TTD"), Micah Gabriel
Katz ("Katz"), and Nate Jones ("Jones") (collectively, "TTD defendants") (all collectively
"defendants") in New Hanover County Superior Court [D.E. 1-1]. On May 30, 2024, defendants
removed the case to the United States District Court for the Eastern District of North Carolina
[D.E. 1]. On June 7, 2024, plaintiffs moved for a TRO, expedited discovery, and a preliminary
injunction [D.E. 16] and filed a memorandum in support [D.E. 16-1]. On June 21, 2024,
defendants responded in opposition [D.E. 20, 25]. On June 28, 2024, plaintiffs replied [D.E. 28].
On July 2, 2024, the court denied plaintiffs' motion for a TRO, expedited discovery, and a
preliminary injunction [D.E. 29].

On July 12, 2024, plaintiffs filed an amended complaint and exhibits [D.E. 30] and motion
to seal. See [D.E. 31]; Am. Compl. [D.E. 74].[1]  In their amended complaint, plaintiffs add as

---

[1] On October 29, 2024, Magistrate Judge Kimberly Swank denied plaintiffs' motion to seal
and ordered plaintiffs to file a public version of their amended complaint and exhibits [D.E. 73].

defendants Pro Therapy Supplies, LLC ("PTS") and Xuong Tang ("Tang") (collectively, with other defendants, "defendants"). See Am. Compl. 1. Plaintiffs assert claims for (1) breach of contract against the FCX and TTD defendants (count one), (2) tortious interference against PTS and Tang (count two), (3) misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. §§ 66-152, et seq. against the FCX and TTD defendants (count three), (4) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, et seq. against the FCX and TTD defendants (count four), (5) fraudulent misrepresentation against all defendants (count five), (6) unfair and deceptive trade practices under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat §§ 75-1, et seq. against the FCX and TTD defendants (count six), (7) civil conspiracy against all defendants (count seven), (8) unjust enrichment against the FCX and TTD defendants (count eight), (9) breach of implied contracts by law against the FCX and TTD defendants (count nine), (10) breach of implied contracts by fact against the FCX and TTD defendants (count ten), and (11) punitive damages against all defendants (count eleven). See Am. Compl. ¶¶ 142–258.

On August 9, 2024, the FCX defendants moved to dismiss the amended complaint with prejudice for failure to state a claim [D.E. 46] and filed a memorandum in support [D.E. 47]. See Fed. R. Civ. P. 12(b)(6). That same day, the TTD defendants moved to dismiss the amended complaint with prejudice for failure to state a claim [D.E. 49] and filed a memorandum in support [D.E. 50]. See Fed. R. Civ. P. 8(a)(2), 9(b), 12(b)(6). On September 3, 2024, PTS and Tang moved to dismiss the amended complaint with prejudice for failure to state a claim [D.E. 61] and filed a memorandum in support [D.E. 62]. See Fed. R. Civ. P. 8(a)(2), 9(b), 12(b)(6).

---

On October 29, 2024, plaintiffs filed a public version of their amended complaint and exhibits [D.E. 74].

On September 6, 2024, plaintiffs responded in opposition to the FCX defendants' motion to dismiss [D.E. 63]. That same day, plaintiffs also responded in opposition to the TTD defendants' motion to dismiss [D.E. 65]. On September 20, 2024, the TTD defendants replied [D.E. 67]. That same day, the FCX defendants replied [D.E. 68]. On September 24, 2024, plaintiffs responded in opposition to PTS and Tang's motion to dismiss [D.E. 71]. Plaintiffs did not request another opportunity to amend their complaint. As explained below, the court grants defendants' motions to dismiss, dismisses with prejudice plaintiffs' amended complaint, and denies plaintiffs' motion for preliminary injunction.

## I.

In 1959, Mueller's father founded Mueller Sports Medicine ("MSM"). See Am. Compl. [D.E. 30] ¶ 43. MSM manufactures and distributes sports medicine products. See id. Mueller began working part-time for MSM when he was 11 years old, began working full-time for MSM when he was 17 years old, and has worked "at every level of MSM" for approximately 50 years. Id. at ¶ 44. While working at MSM, Mueller developed "proprietary strategies, processes, methods, and techniques for how a product supplier can successfully and quickly obtain inclusion of its products into product lines of the largest medical product distributors, retailers, pharmacies, and similar companies in the world without having to adhere or operate through traditional product line inclusion applications and processes." Id. at ¶ 45. Mueller refers to these "processes" as "Mueller Methods." Id.

In implementing "Mueller Methods," Mueller began "acquiring, collecting, accumulating, organizing, and retaining extensive information into how [d]istributors and [r]etailers operated, including knowing who within the organizations held decision making authority for product lines, what types of products they were actively seeking, how they operated in terms of product volume, what were their expectations of suppliers relative to interactions with individual Teams or

3

competing products." Id. at ¶ 48. Mueller compiled this information into what he refers to as "Mueller Materials." Id. Together, Mueller refers to his method and information as "Mueller Method and Materials." Id. at ¶ 52. Plaintiffs allege one specific method involved "grassroots leg work and sales strategies to generate demand for a new product at local retail locations whose product lines were more regionally selected and controlled by larger district and territory product manages." Id. at ¶ 46. Mueller employed this same method with distributors "by generating demand on a team-by-team, sports-by-sports, conference-by-conference, and/or similar groups, similar to an individual retail story, territory, or region." Id. at ¶ 47. Mueller refers to this method as the "Backdoor." Id. at ¶ 50.

Plaintiffs allege "Mueller Methods and Materials" made MSM a successful company and helped MSM secure "industry relationships, contracts, agreements, and sales." Id. at ¶ 49. MSM uses "Mueller Methods" in its sales and product development operations. Id. In 2016, Mueller semi-retired from MSM and created MichJeff to provide consulting services in the sports medicine industry. See id. at ¶ 51. Plaintiffs allege MichJeff possesses all "ownership and rights of transferability of the Mueller Methods and Materials." Id. at ¶ 52.

"Approximately 20 years ago," Mueller began working with PTS and Tang "to provide marketing and fulfillment services for MSM . . . ." Id. at ¶ 53. After Mueller founded MichJeff, plaintiffs engaged PTS and Tang "as both a purchaser and a marketer" for MichJeff's products. See id. at ¶ 54.

FCX sells and distributes "Insite," a shoe insole product. Id. at ¶ 62. Reinhartz is President or Managing Director of FCX. See id. at ¶ 4. Reinhartz has a background in podiatry. See id. at ¶ 68. On June 22, 2016, Mueller met Reinhartz at a trade show and learned about the Insite insole. See id. at ¶¶ 63–68. In 2017, FCX hired Mueller and MichJeff "to help FCX develop and implement processes and strategies to refine Insite insoles as a product, grow its sales, increase its

4

profitability, and provide similar consulting." Id. at ¶ 76. Plaintiffs entered an independent contractor agreement ("ICA") and a confidential disclosure agreement ("CDA") with FCX. See id. at ¶¶ 76–85. Plaintiffs allege that plaintiffs and the FCX defendants understood that "not only were . . . Mueller's Methods unique and valuable," but that plaintiffs' "Mueller Methods and Materials" were proprietary and covered by the CDA. Id. at ¶ 85.

In 2020, plaintiffs were introduced to Katz, Jones, and TTD. See id. at ¶ 86. At that time, TTD was "a current or soon-to-be licensee of FCX's Insite" and planned to create a separate product, Move Insoles. Id. at ¶ 87. In 2022, plaintiffs and TTD "entered into an agreement" ("TTD agreement") in which plaintiffs agreed to "provide a similar, but broader suite of services to TTD" than what plaintiffs provided to FCX. Id. at ¶ 89. Plaintiffs allege TTD agreed "not [to] circumvent" plaintiffs' services or "Mueller Methods and Materials." Id. at ¶ 91. Plaintiffs also allege that between October 2023 and April 2024, TTD, Katz, and Jones "on multiple occasions, assured Plaintiffs that a new or revised agreement would be forthcoming, including increases to compensation in the form(s) of bonuses, a finder's fee, increased equity, and/or all three." Id. at ¶ 92. Throughout the contractual relationship with FCX and TTD, plaintiffs shared "Mueller Methods and Materials" with the FCX and TTD defendants. See id. at ¶¶ 97–100. Plaintiffs also introduced the FCX and TTD defendants to PTS and Tang. See id. at ¶ 100k.

On March 20, 2024, FCX issued a notice of termination to plaintiffs with a termination date of April 19, 2024. See id. at ¶ 82. On April 19, 2024, FCX stopped paying plaintiffs. See id. at ¶ 83. On April 5, 2024, plaintiffs wrote to FCX to withdraw plaintiffs' "consent under the CDA for FCX to access and use the Mueller Methods and Materials." Id. at ¶ 84.

Plaintiffs allege that FCX and TTD have continued to use and benefit from plaintiffs' "Mueller Methods and Materials" without paying plaintiffs. See id. at ¶¶ 122–41. Plaintiffs also allege the defendants conspired to create a purchasing, fulfillment, and marketing relationship

5

between FCX, TTD, and PTS in violation of plaintiffs' agreements with each organization. <u>See</u> <u>id.</u> at ¶¶ 101–21.

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677–80 (2009); <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 554–63 (2007); <u>Coleman v. Md. Ct. of Appeals</u>, 626 F.3d 187, 190 (4th Cir. 2010), <u>aff'd</u>, 566 U.S. 30 (2012); <u>Giarratano v. Johnson</u>, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Iqbal</u>, 556 U.S. at 678 (quotation omitted); <u>see</u> <u>Twombly</u>, 550 U.S. at 570; <u>Giarratano</u>, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." <u>Massey v. Ojaniit</u>, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); <u>see</u> <u>Clatterbuck v. City of Charlottesville</u>, 708 F.3d 549, 557 (4th Cir. 2013), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Reed v. Town of Gilbert</u>, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." <u>Giarratano</u>, 521 F.3d at 302 (quotation omitted); <u>see</u> <u>Iqbal</u>, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [its] claims," <u>Twombly</u>, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." <u>Iqbal</u>, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on judicial experience and common sense." <u>Iqbal</u>, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. <u>Id.</u>

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." <u>E.I. du Pont de Nemours & Co. v. Kolon Indus.</u>,

6

Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

"[N]aked assertions of wrongdoing," devoid of "factual enhancement," do not "cross the line between possibility and plausibility of entitlement to relief." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quotations omitted). A plaintiff armed with nothing more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," cannot proceed into the litigation process. Twombly, 550 U.S. at 555; see Francis, 588 F.3d at 193.

A legally sufficient complaint must meet the standards of Federal Rule of Civil Procedure 8. See Francis, 588 F.3d at 192. Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(a)(2) exists to ensure that defendants have adequate notice of the nature of the claims against them. See, e.g., Francis, 588 F.3d at 192.

For plaintiff's claims arising under North Carolina law, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817

7

F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Twin City Fire Ins., 433 F.3d at 369 (quotation omitted).[2] A federal court, however, "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

### A.

Plaintiffs allege the FCX defendants breached the ICA by circumventing its terms to form business relationships with TTD and by continuing to use "Mueller Methods and Materials" after terminating the ICA. See Am. Compl. ¶¶ 142–47. Plaintiffs allege the TTD defendants violated the TTD agreement by circumventing and continuing to use "Mueller Methods and Materials" after the TTD agreement expired. See id. at ¶¶ 148–150. Plaintiffs concede, however, the TTD agreement expired before the TTD defendants' alleged breach, but argue the parties intended the anticircumvention provision to "survive the expiration of the contract." Id. at ¶ 150. Alternatively, plaintiffs allege the TTD defendants' conduct implicitly reflects their intent for the anticircumvention provision to survive the expiration of the TTD agreement. See id. at ¶ 151.

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); see Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C.

---

[2] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

260, 276, 827 S.E.2d 458, 472 (2019) (per curiam); Cantrell v. Woodhill Enters., Inc., 273 N.C. 490, 497, 160 S.E.2d 476, 481 (1968); Montessori Child.'s House of Durham v. Blizzard, 244 N.C. App. 633, 636, 781 S.E.2d 511, 514 (2016); McLamb v. T.P., Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005), perm. app. denied, 360 N.C. 290, 627 S.E.2d 621 (2006).

North Carolina law imparts into every contract "an implied covenant of good faith and fair dealing . . . ." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (quotation omitted). Under the covenant, "neither party will do anything which injures the right of the other to receive the benefits of the agreement." Robinson v. Deutsche Bank Nat'l Tr. Co., No. 5:12-CV-590, 2013 WL 1452933, at *11 (E.D.N.C. Apr. 9, 2013) (unpublished) (quotation omitted). Where parties have executed a written contract, an action for "breach of the covenant of good faith and fair dealing is part and parcel of a claim for breach of contract." McKinney v. Nationstar Mortg., LLC, No. 5:15-CV-637, 2016 WL 3659898, at *8 (E.D.N.C. July 1, 2016) (unpublished) (alteration and quotation omitted); see Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000), aff'd, 18 F. App'x 147 (4th Cir. 2001) (per curiam) (unpublished); Murray v. Nationwide Mut. Ins., 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996).

The FCX defendants argue plaintiffs' breach of contract claim relies upon an agreement "that was never executed." [D.E. 47] 3. Although the FCX defendants concede that they signed the ICA agreement attached to plaintiffs' amended complaint, the FCX defendants argue plaintiffs' amended complaint includes an additional "unsigned draft agreement." Id. at 4. The FCX defendants argue that this unsigned draft agreement, written seven years after the parties executed the ICA, "was never part of the parties' agreement at all." Id. Moreover, the FCX defendants argue the portion of the ICA that they did agree to "says nothing whatsoever of the ownership or rights to any information that the Plaintiffs brought to the relationship, much less the Mueller Methods and Materials." Id. at 5. Additionally, the FCX defendants contend the ICA does not

9

entitle plaintiffs to continuing compensation after the parties terminate the ICA. "Instead, the ICA sets forth a finite, agreed-upon compensation for the Plaintiffs—not an indefinite, perpetual compensation that survives the ICA's termination." Id.

As for the CDA, the FCX defendants argue plaintiffs' amended complaint "fails to identify specific information that FCX received or has improperly used." Id. at 7. In support, the FCX defendants note that plaintiffs only vaguely describe "Mueller Methods and Materials." Id. Moreover, the FCX defendants argue that plaintiffs "cannot state a claim for breach of the CDA by broadly alleging that at some undisclosed point they shared something that falls somewhere within the purview of the amorphous categories 'Mueller Methods' and 'Mueller Materials.'" Id. at 8. The FCX defendants also argue that plaintiffs have failed to plausibly allege that the CDA covers "Mueller Methods and Materials." Id. at 9–10.

The TTD defendants argue plaintiffs' breach of contract claim fails because the TTD agreement expired before the alleged breach and because plaintiffs fail to plausibly allege that the TTD defendants breached the TTD agreement. See [D.E. 50] 19. Moreover, the TTD defendants argue they never understood the anticircumvention provision to survive the expiration of the TTD agreement and that TTD defendants never manifested an intent for the provision to do so. See id. at 20–22.

In denying plaintiffs' TRO motion, the court considered the strength of plaintiffs' breach of contract claim against the TTD and FCX defendants. See [D.E. 29] 11–12. Plaintiffs' amended complaint has only further weakened plaintiffs' breach of contract claim. Plaintiffs fail to plausibly allege how either the FCX defendants or the TTD defendants breached their contracts with plaintiffs. None of the attached exhibits support plaintiffs' assertions that the contracts with the FCX and TTD defendants protected the confidentiality of "Mueller Methods and Materials." See [D.E. 74-1] 1–17.

As for the FCX defendants, the ICA protected the FCX defendants from plaintiffs' misappropriation of "systems, methods, procedures, and written materials." Id. at 6. The only reference to FCX's non-disclosure obligations appears in an unsigned, 2024 addendum to the ICA that the FCX defendants deny executing. See [D.E. 47] 3–5. Moreover, plaintiffs admit the parties never executed this addendum. See Am. Compl. ¶ 81. Likewise, the TTD agreement contains no provision protecting or even mentioning "Mueller Methods and Materials." See [D.E. 74-3]. Furthermore, even if the court assumes without deciding that the CDA covers "Mueller Methods and Materials," plaintiffs fail to plausibly allege that FCX breached the CDA. Instead, plaintiffs offer only vague, conclusory accusations that the FCX defendants have continued to employ "Mueller Methods and Materials." See, e.g., Am. Compl. ¶¶ 122–26.

As for the TTD defendants, the TTD agreement expired on October 2023 and TTD did not renew the contract. See [D.E. 74-3] 2; Am. Compl. ¶ 92. Thus, plaintiffs fail to demonstrate "the existence of a valid contract." Poor, 138 N.C. App. at 26, 530 S.E.2d at 843.

In opposition to this conclusion, plaintiffs allege that "parties to the TTD Agreement intended for the anticircumvention provision to survive the expiration of the contract." Am. Compl. ¶ 149. The court, however, rejects this implausible contention because it contradicts the contract itself. Compare Am. Compl. ¶ 149 with [D.E. 74-3] 2. See Goines, 822 F.3d at 166; Fayetteville Invs., 936 F.2d at 1465.

Alternatively, assuming without deciding the contracts covered plaintiffs' "Mueller Methods and Materials," plaintiffs have failed to plausibly allege that the FCX and TTD defendants continued to use plaintiffs' "Mueller Methods and Materials" after the parties terminated their respective contracts. Indeed, apart from conclusory statements and naked speculation, plaintiffs do not plausibly allege that the FCX and TTD defendants have continued to use (or ever used) plaintiffs' "Mueller Methods and Materials." Likewise, plaintiffs fail to

plausibly allege either the FCX or TTD defendants "circumvented" the contracts. Accordingly, the court dismisses count one of the amended complaint.

B.

Plaintiffs allege PTS and Tang tortiously interfered with plaintiffs' contracts with the FCX and TTD defendants. See Am. Compl. ¶¶ 117–19, 122–26, 157–64. Under North Carolina law, tortious interference with a contractual relationship requires: (1) a valid contract between the plaintiff and a third party; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) the defendant acts without justification; and (5) actual damage to the plaintiff. Benjamin v. Sparks, 173 F. Supp. 3d 272, 289–90 (E.D.N.C. 2016), aff'd, 986 F.3d 332 (4th Cir. 2021); see United Lab'ys. Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). Acts of non-outsiders "are presumed to have been done in the interest of the [c]orporation" and are therefore "justified." Embree Constr. Grp., Inc. v. Ranfcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992) (quotation omitted). Any party that has a "legitimate business interest . . . in the subject matter" is a "non-outsider." Smith v. Ford Motor Co., 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976). Tortious interference claims against non-outsiders generally fail because plaintiffs cannot satisfy the tort's fourth element. See Embree, 330 N.C. at 498–99, 411 S.E.2d at 924–25; Wilson v. McClenny, 262 N.C. 121, 133, 136 S.E.2d 569, 578 (1964); Privette v. Univ. of N.C. Chapel Hill, 96 N.C. App. 124, 134–35, 385 S.E.2d 185, 191 (1989).

A plaintiff can overcome this presumption by showing that the non-outsider took the action for an improper reason. See Embree, 330 N.C. at 498, 411 S.E.2d at 924; Stec v. Fuzion Inv. Cap., LLC, No. 11-CVS-4241, 2012 WL 1524487, at *8 (N.C. Super. Apr. 30, 2012) (unpublished). To do so, a plaintiff must show that the defendant acted with malice and for a reason "not reasonably related to the protection of a legitimate business interest." Sellers v. Morton, 191 N.C. App. 75,

12

82, 661 S.E.2d 915, 921 (2008); Mkt. Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 158, 520 S.E.2d 570, 581 (1999). Merely alleging an improper actual or primary motive, however, will not suffice. Instead, the "complaint must admit of no motive for interference other than malice." Pinewood Homes, Inc. v. Harris, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832–33 (2007); see Filmar Racing, Inc. v. Stewart, 141 N.C. App. 668, 674–75, 541 S.E.2d 733, 738 (2001); Privette, 96 N.C. App. at 135, 385 S.E.2d at 191; see also Welch-Walker v. Guilford Cnty. Bd. Educ., No. 1:12-CV-149, 2014 WL 6997596, at *7 & n.5 (M.D.N.C. Dec. 10, 2014) (unpublished); Jones v. Am. Airlines Inc., No. 5:08-CV-236, 2008 WL 9411160, at *5 (E.D.N.C. Oct. 16, 2008) (unpublished).

Plaintiffs argue that PTS and Tang continued their business relationship with the FCX and TTD defendants after plaintiffs' relationship with the FCX and TTD defendants dissolved. See Am. Compl. ¶¶ 122–26. Plaintiffs contend that they contracted with the FCX and TTD defendants to provide marketing, sales advice, and consultation and introduced PTS and Tang to the FCX and TTD defendants in fulfillment of plaintiffs' obligations under these contracts. See id. at ¶¶ 93, 100h–100m, 101–05. Plaintiffs contend that they maintained the business relationships between the defendants. See id. at ¶¶ 100h–100m.

PTS and Tang were non-outsiders to the plaintiffs' contracts with the FCX and TTD defendants. See Smith, 289 N.C. at 87, 221 S.E.2d at 292. North Carolina law affords PTS and Tang the presumption that their actions were justified. See Embree, 330 N.C. at 498, 411 S.E.2d at 924. Plaintiffs fail to plausibly allege facts that would overcome this presumption. Thus, the court dismisses count two of the amended complaint.

## C.

In count three, plaintiffs allege misappropriation of trade secrets under the TSPA against the FCX and TTD defendants. See Am. Compl. ¶¶ 165–71. The FCX defendants argue the TSPA

does not apply to plaintiffs' claims because plaintiffs fail to plausibly allege that the FCX and TTD defendants' purported misappropriation occurred in North Carolina. See [D.E. 147] 10–11. The TTD defendants argue plaintiffs' TSPA claim fails because (1) plaintiffs fail to describe the trade secret with particularity; (2) plaintiffs fail to allege a valid trade secret under North Carolina law; (3) plaintiffs fail to allege they took reasonable steps to maintain the secrecy of the alleged trade secrets; and (4) plaintiffs fail to allege misappropriation. See [D.E. 50] 23–29.

North Carolina uses the lex loci delicti test when assessing TSPA misappropriation claims. See Domtar AI Inc. v. J.D. Irving, Ltd., 43 F. Supp. 3d 635, 641 (E.D.N.C. 2014); SciGrip, Inc. v. Osae, 373 N.C. 409, 420–21, 838 S.E.2d 334, 343–44 (2020). Under the lex loci delicti test, courts apply "the substantive law of the state where the injury or harm was sustained or suffered, which is, ordinarily, the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place." SciGrip, 373 N.C. at 420, 838 S.E.2d at 343 (quotation omitted); see Harco Nat'l Ins. v. Grant Thornton LLP, 206 N.C. App. 687, 695, 698 S.E.2d 719, 724 (2010). Thus, where a defendant allegedly misappropriates trade secrets outside of North Carolina, the TSPA does not apply. See, e.g., Domtar AI Inc., 43 F. Supp. 3d at 641; SciGrip, 373 N.C. at 424, 838 S.E.2d at 346; Elior, Inc. v. Thomas, No. 23 CVS 12616, 2024 WL 1739861, at *17 (N.C. Super. Ct. Apr. 22, 2024) (unpublished).

As for the FCX defendants, FCX and Reinhartz reside in Florida. See Am. Compl. at ¶¶ 3–4. Plaintiffs allege that defendants misappropriated plaintiffs' trade secrets by continuing business relationships with each other after terminating their relationships with plaintiffs. See id. at ¶¶ 165–71. Plaintiffs "fail[] to allege any fact that would support an inference that the last act giving rise to the injury occurred anywhere other than in" Florida. Elior, Inc., 2024 WL 1739861, at *17. Thus, the TSPA does not apply to plaintiffs' claims against the FCX defendants. See, e.g., id.; Domtar AI Inc., 43 F. Supp. 3d at 641; SciGrip, 373 N.C. at 424, 838 S.E.2d at 346.

14

Accordingly, the court dismisses count three of the amended complaint against the FCX defendants.

As for the TTD defendants, TTD resides in Delaware and Georgia. See Am. Compl. ¶ 5. Katz resides in Georgia. See id. at ¶ 6. Jones resides in California. See id. at ¶ 7. According to plaintiffs, they helped the FCX and TTD defendants facilitate a distribution relationship with Carolina Home Medical. See id. at ¶¶ 100(n)–(o). Carolina Home Medical is incorporated in North Carolina and has its principal place of business in North Carolina. See N.C. Sec'y of State Bus. Registration Search, https://www.sosnc.gov/online_services/search/by_title/search_Business_Registration (search "Carolina Home Medical" in "Organization Name" field) (last visited Feb. 24, 2025). When the court analyzed plaintiffs' TSPA claim at the TRO stage, the court found that "based on the limited record," and in light of plaintiffs' assertions that the defendants intended to continue their business with Carolina Home Medical after the expiration of their contracts, the TSPA applied to the TTD defendants. [D.E. 29] 29.

Notably, plaintiffs' amended complaint omits any allegation that the defendants intended to continue business relationships with Carolina Home Medical. Instead, plaintiffs allege the FCX and TTD defendants have continued to use plaintiffs' "Mueller Methods and Materials" without reference to Carolina Home Medical, the only North Carolina entity. See Am. Compl. ¶¶ 101–21, 165–71 (alleging use of "Muller Methods and Materials" without reference to Carolina Home Medical). Plaintiffs fail to tether the alleged misappropriation to a North Carolina entity. Indeed, plaintiffs "fail[] to allege any fact that would support an inference that the last act giving rise to the injury occurred anywhere other than" Georgia, Florida, Delaware, or California. Elior, Inc., 2024 WL 1739861, at *17. Thus, the TSPA does not apply to plaintiffs' claims against the TTD defendants. See, e.g., id.; Domtar AI Inc., 43 F. Supp. 3d at 641; SciGrip, 373 N.C. at 424, 838

15

S.E.2d at 346. Accordingly, the court dismisses count three of the amended complaint against the TTD defendants.

Alternatively, to state a trade secret misappropriation claim under the TSPA, a plaintiff must plausibly allege "that a defendant: (1) knows or should have known of the trade secret; and (2) has had specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." GE Betz, Inc. v. Conrad, 231 N.C. App. 214, 230, 752 S.E.2d 634, 649 (2013) (cleaned up); see N.C. Gen. Stat. § 66-155. As for the second element, "North Carolina courts generally . . . require evidence that the defendant actually acquired or used trade secrets." RLM Commc'ns, Inc. v. Tuschen, 831 F.3d 190, 200–01 (4th Cir. 2016) (collecting cases).

A "trade secret" is "business or technical information, including . . . a formula, pattern, program, device, compilation of information, method, technique, or process" that "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development" by "persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3). Courts consider six factors to determine whether information constitutes a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

Wells Fargo Ins. Servs., 372 N.C. at 278, 827 S.E.2d at 473 (cleaned up); see Progress Solar Sols. v. Fire Prot., Inc., No. 5:17-CV-152, 2020 WL 5732621, at *8 (E.D.N.C. Sept. 24, 2020) (unpublished) (collecting cases); Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc., 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).

16

Courts applying North Carolina law "have refused to protect customer names and addresses or personal relationships with customers as 'trade secrets.'" Philips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009); see, e.g., 360 Mortg. Grp., LLC v. Stonegate Mortg. Corp., No. 5:14-CV-310, 2016 WL 4943933, at *5 (E.D.N.C. Sept. 14, 2016) (unpublished); Eli Rsch., LLC v. Must Have Info Inc., No. 2:13-CV-695, 2015 WL 5895460, at *8–9 (M.D. Fla. Oct. 6, 2015) (unpublished) (applying North Carolina law); Asheboro Paper & Packaging, Inc. v. Dickinson, 599 F. Supp. 2d 664, 677 (M.D.N.C. 2009) ("Under North Carolina law, customer information maintained in the memory of a departing employee is not a trade secret."); UBS Painewebber, Inc. v. Aiken, 197 F. Supp. 2d 436, 447–48 (W.D.N.C. 2002); Combs & Assocs., Inc. v. Kennedy, 147 N.C. App. 362, 370, 555 S.E.2d 634, 640 (2001); Novacare Orthotics & Prosthetics E., Inc. v. Speelman, 137 N.C. App. 471, 477–78, 528 S.E.2d 918, 922 (2000). Moreover, "matters of public knowledge or of general knowledge in an industry or information that is freely available throughout an industry cannot be claimed as a trade secret." SCR-Tech LLC v. Evonik Energy Servs. LLC, No. 08 CVS 16632, 2011 WL 3209080, at *11 (N.C. Super. Ct. July 22, 2011) (unpublished) (cleaned up); see, e.g., Found. Bldg. Materials, LLC v. Conking & Calabrese, Co., No. 23 CVS 9285, 2023 WL 4561583, at *12 (N.C. Super. Ct. July 7, 2023) (unpublished) ("General descriptions of information that are not unique to [the plaintiff] are insufficient to identify a trade secret."); Aym Techs., LLC v. Rodgers, No. 16-CVS-21788, 2019 WL 5257950, at *7 (N.C. Super. Ct. Oct. 16, 2019) (unpublished). Furthermore, "[a]cquiring and using . . . knowledge and experience" gained during employment "does not constitute misappropriation of trade secrets under North Carolina law." RLM Commc'ns, Inc. v. Tuschen, 66 F. Supp. 3d 681, 696–97 (E.D.N.C. 2014) (collecting cases), aff'd, 831 F.3d 190 (4th Cir. 2016).

Plaintiffs allege "Mueller Methods and Materials" are trade secrets. See Am. Compl. ¶¶ 165–71. What plaintiffs now call "Mueller Methods and Materials," plaintiffs previously called

17

"relationship capital" and "industry knowledge." <u>Compare</u> Am. Compl. ¶¶ 45–52 <u>with</u> [D.E.1-1] ¶¶ 15–21 <u>and</u> [D.E. 29] 2.[3]  Although plaintiffs have attempted in their amended complaint to revamp their trade secrets claim with new words, "Mueller Methods and Materials" still refers to the same cluster of industry relationships, contact information, and soft skills the court already found did not qualify as trade secrets under North Carolina law. <u>See</u> [D.E. 29] 6–11.  Plaintiffs' recycled argument fares no better this time.

According to plaintiffs, "Mueller Methods" consist of strategies, processes, methods, and techniques for how a supplier can "successfully and quickly" obtain inclusion of its product into product lines. Am. Compl. ¶ 45.  Plaintiffs' "Mueller Materials" consist of compiled information about how distributors and retailers operate and the identity of decisionmakers within those organization. <u>See</u> <u>id.</u> at ¶ 48.

Plaintiffs have not plausibly alleged plaintiffs' "Mueller Methods and Materials" amount to protected trade secrets under North Carolina law.  The six-factor analysis supports this conclusion.  As for the first factor, plaintiffs fail to plausibly allege plaintiffs' "Mueller Methods and Materials" consist of information not widely known outside the business.  Indeed, plaintiffs concede plaintiffs' "Mueller Methods and Materials" emerged from plaintiffs' own experiences in sports medicine.  <u>See</u> <u>id.</u> at ¶¶ 45–52.  But plaintiffs' do not allege their experiences in sports medicine have afforded them any unique insight or information.  Rather, plaintiffs merely allege that "Mueller Methods and Materials" amount to a documentation of their own observations in sports medicine.  The FCX and TTD defendants also engaged in sports medicine and would be privy to the same information. <u>See, e.g.,</u> Am. Compl. ¶¶ 58–60, 86–87, 101.  Additionally, the

---

[3]  In some parts of the amended complaint plaintiffs merely swapped out the words "relationship capital" and "industry knowledge" with "Mueller Methods and Materials." Tellingly, plaintiffs failed to omit all references to Mueller's "relationship capital" and "industry knowledge" in their amended complaint. <u>See, e.g.,</u> Am. Compl. ¶¶ 209–10.

plaintiffs' descriptions of the so-called "Backdoor" technique are too vague to plausibly suggest that this technique constitutes a trade secret under North Carolina law. See Am. Compl. ¶¶ 45–52. Thus, the first factor weighs against plaintiffs.

As for the second factor, plaintiffs' allegations offer little insight into the extent to which plaintiffs' "Mueller Methods and Materials" were known to employees and others involved in the business. Thus, this factor remains neutral.

As for the third factor, plaintiffs have failed to plausibly allege they undertook reasonable steps to protect the secrecy of plaintiffs' "Mueller Methods and Materials." Plaintiffs allege their contracts with the FCX and TTD defendants include confidential protections for "Mueller Methods and Materials." See, e.g., Am. Compl. ¶¶ 91, 95–100. The court, however, has reviewed the relevant contracts. See [D.E. 74-1]; [D.E. 74-2]; [D.E. 74-3]. With the possible exception of the CDA, none of the contracts with the FCX or TTD defendants contain confidentiality provisions protecting "Mueller Methods and Materials." Moreover, the CDA fails to plausibly describe plaintiffs' "Mueller Methods and Materials." Thus, this factor weighs against plaintiffs.

As for the fourth factor, plaintiffs fail to plausibly allege plaintiffs' "Mueller Methods and Materials" were valuable to its competitors. To be sure, plaintiffs conclude that "Mueller Methods and Materials" were valuable to competitors. See, e.g., Am. Compl. ¶¶ 85, 127–31, 174, 226, 239. But plaintiffs offer no more than threadbare conclusions. Moreover, the court cannot deduce the value of plaintiffs' "Mueller Methods and Materials" because, as discussed, plaintiffs fail to plausibly describe plaintiffs' "Mueller Methods and Materials." In short, plaintiffs' claim that "Mueller Methods and Materials" are valuable trade secrets does not make them a valuable trade secret. Accordingly, the fourth factor weighs against plaintiffs.

As for the fifth factor, the amount of effort or money expended in developing plaintiffs' "Mueller Methods and Materials" does not support plaintiffs' trade secret claim. Apart from naked

19

speculation, plaintiffs offer little insight into the amount of effort expended in developing plaintiffs' "Mueller Methods and Materials." See id. at ¶¶ 85, 127–31. Moreover, plaintiffs do not plausibly allege the money spent on developing plaintiffs' "Mueller Methods and Materials." Accordingly, the fifth factor weighs against plaintiffs.

As for the sixth factor, the ease with which others could properly acquire or duplicate "Mueller Methods and Materials" weighs against plaintiffs' trade secret claim. Plaintiffs' "Mueller Methods" consist of strategies, processes, methods, and techniques for how a supplier can successfully and quickly obtain inclusion of its products into product lines. See id. at ¶ 45. Plaintiffs' "Mueller Materials" consist of compiled information about how distributors and retailers operate and information about decisionmakers within those organizations. See id. at ¶ 48.

Plaintiffs' business relationships are not trade secrets under North Carolina law. See, e.g., Hope, 631 F. Supp. 2d at 721; Dickinson, 599 F. Supp. 2d at 677; Duo-Fast Carolinas, Inc. v. Scott's Hill Hardware & Supply Co., No. 16 CVS 9343, 2018 WL 264607, at *5–7 (N.C. Super. Ct. Jan. 2, 2018) (unpublished) (collecting cases); Amerigas Propane, L.P. v. Coffey, No. 14 CVS 376, 2015 WL 6093207, at *12 (N.C. Super. Ct. Oct. 15, 2015) (unpublished). Moreover, plaintiffs fail to show that their industry knowledge is not "readily ascertainable through independent development." N.C. Gen. Stat. § 66-152(3). Instead, Mueller's relevant industry knowledge "would have been easily accessible to defendant[s] through a local telephone book," Speelman, 137 N.C. App. at 478, 528 S.E.2d at 922, or "trade show and seminar attendance lists." Combs & Assocs., 147 N.C. App. at 370, 555 S.E.2d at 640. Furthermore, plaintiffs fail to plausibly allege that their purported trade secrets include confidential information that suffices to convert bare customer lists or personnel records into trade secrets. See Speelman, 137 N.C. App. at 478, 528 S.E.2d at 922; cf. 360 Mortg. Grp., 2016 WL 4943933, at *5; Byrd's Lawn & Landscaping, Inc. v. Smith, 142 N.C. App. 371, 375–76, 542 S.E.2d 689, 692 (2001); Glover Constr. Co. v. Sequoia

20

Servs., LLC, No. 18 CVS 1900, 2020 WL 3393065, at *16–17 (N.C. Super. Ct. June 18, 2020) (unpublished). Instead, plaintiffs merely had better contacts in the sports medicine industry than defendants. See Am. Compl. ¶¶ 45, 49–50, 65, 67, 74, 93, 97, 99–100.

The court has considered plaintiffs' TSPA claim under the proper standard. Plaintiffs fail to plausbily allege their TSPA claim. Thus, the court dismisses count three of the amended complaint.

Alternatively, plaintiffs fail to plausibly allege that their "Mueller Methods and Materials" are not "readily ascertainable through independent development." N.C. Gen. Stat. § 66-152(3). Thus, plaintiffs have failed to state a claim for misappropriation of trade secrets under the TSPA. See, e.g., Dickinson, 599 F. Supp. 2d at 677–78; Krawiec v. Manly, 370 N.C. 602, 611–12, 811 S.E.2d 542, 549 (2018).

### D.

In count four, plaintiffs allege misappropriation of trade secrets under the DTSA against the FCX and TTD defendants. See Am. Compl. ¶¶ 172–80. The DTSA allows an "owner of a trade secret that is misappropriated [to] bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "To prevail on such a claim, a plaintiff must accordingly establish (1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." dmarcian, Inc. v. dmarcian Eur. BV, 60 F.4th 119, 141 (4th Cir. 2023). The DTSA defines a trade secret as "financial, business, scientific, technical, economic, or engineering information, including . . . programs[ ] or codes," where the "owner thereof has taken reasonable measures to keep such information secret[,] and the information derives independent economic value . . . from not being generally known." 18 U.S.C. § 1839(3).

21

Assuming without deciding that plaintiffs' "Mueller Methods and Materials" constitute trade secrets under the DTSA, plaintiffs have failed to plausibly allege misappropriation or that plaintiffs' took reasonable measures to keep "Mueller Methods and Materials" secret. Once again, plaintiffs make only vague, conclusory accusations that defendants have misappropriated plaintiffs' "Mueller Methods and Materials." See, e.g., Am. Compl. ¶¶ 122–26. Plaintiffs, however, cannot plausibly allege misappropriation by mere speculation, pleading "upon information and belief," and generically reciting the claim's elements. See, e.g., Am. Compl. ¶¶ 106, 117–18, 135–138, 140–41, 169, 172–180. Cf. Kashdan v. George Mason Univ., 70 F.4th 694, 701 (4th Cir. 2023) ("Although a plaintiff may initially plead parts of his case 'upon information and belief,' his allegations may not be wholly conclusory."); Mystic Retreat Med Spa & Weight Loss Ctr. v. Ascentium Cap. LLC, 615 F. Supp. 3d 379, 384–85 (M.D.N.C. 2022) (collecting cases); Lemon v. Myers Bigel, P.A., No. 5:18-CV-200, 2019 WL 1117911, at *16–17 (E.D.N.C. Mar. 11, 2019) (unpublished); Carter v. Va. Dep't of Game & Inland Fisheries, No. 3:16CV661, 2018 WL 3614975, at *9 (E.D. Va. July 27, 2018) (unpublished). Here, plaintiffs fail to plausibly allege that the FCX or TTD defendants misappropriated plaintiffs' "Mueller Methods and Materials."

Alternatively, plaintiffs fail to plausibly allege that plaintiffs "took reasonable measures to keep [plaintiffs' Mueller Methods and Materials] secret." 18 U.S.C. § 1839(3). As mentioned, with the possible exception of the CDA, none of the contracts with the FCX or TTD defendants contain confidentiality provisions protecting "Mueller Methods and Materials." Moreover, the CDA fails to plausibly describe plaintiffs' "Mueller Methods and Materials." Furthermore, plaintiffs fail to plausibly describe their "Mueller Methods and Materials" with "sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." Sysco Mach.

22

Corp. v. DCS USA Corp., No. 5:23-CV-134, 2023 WL 7752051, at *2 (E.D.N.C. Nov. 15, 2023) (unpublished) (quotation omitted).

Plaintiffs have failed to state a claim for misappropriation of trade secrets under the DTSA. Thus, the court dismisses count four of the amended complaint.

E.

In count five, plaintiffs allege fraudulent misrepresentation against all defendants. See Am. Compl. ¶¶ 181–90. North Carolina law requires plaintiffs to allege five elements to state a fraud claim: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party. See Forbis v. Neal, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007); Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992); Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); Rahamankhan Tobacco Enters. Priv. Ltd. v. Evans MacTavish Agricraft, Inc., 989 F. Supp. 2d 471, 476 (E.D.N.C. 2013). Additionally, "any reliance on the allegedly false representations must be reasonable." Forbis, 361 N.C. at 527, 649 S.E.2d at 387; see Johnson v. Owens, 263 N.C. 754, 756, 140 S.E.2d 311, 313 (1965); Laschkewitsch v. Legal & Gen. Am., Inc., 247 F. Supp. 3d 710, 721 (E.D.N.C. 2017), aff'd, 725 F. App'x 252 (4th Cir. 2018) (per curiam) (unpublished).

Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff who alleges a fraud claim to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Under Rule 9(b), a party must allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what they obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quotation omitted); see United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 455–61 (4th Cir. 2013); Strum v. Exxon Co., U.S.A., 15 F.3d 327, 331 (4th Cir. 1994).

23

"These facts are often referred to as the who, what, when, where, and how of the alleged fraud." Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc., 888 F.3d 696, 705 (4th Cir. 2018) (quotations omitted).

Plaintiffs' amended complaint lacks sufficient "factual enhancement" to move plaintiffs' "naked assertions" of fraud against the defendants from possible to plausible. Francis, 588 F.3d at 193. Indeed, plaintiffs fail to allege facts sufficient to establish the time, place, or content of defendants' alleged misrepresentation. See Fed. R. Civ. P. 9(b); Bakery & Confectionary Union & Indus. Int'l Pension Fund, 888 F.3d at 705. Likewise, plaintiffs fail to plausibly allege reliance upon defendants' alleged misrepresentation. Thus, plaintiffs' fraudulent misrepresentation claim fails. See Twombly, 550 U.S. at 555; Francis, 588 F.3d at 193; Fed. R. Civ. P. 9(b).

Plaintiffs fail to state a claim for fraudulent misrepresentation under North Carolina law. Thus, the court dismisses count five of the amended complaint.

F.

In count six, plaintiffs allege violations of the UDTPA against the FCX and TTD defendants. See Am. Compl. ¶¶ 191–201. The UDTPA declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce . . . ." N.C. Gen. Stat. § 75-1.1(a). To state an unfair and deceptive trade practices claim, a plaintiff must plausibly allege: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs. See SciGrip, 373 N.C. at 426, 838 S.E.2d at 347; Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. A practice is deceptive if it has the capacity or tendency to deceive." Walker, 362 N.C. at 72, 653 S.E.2d at 399 (cleaned up). "[I]t is not necessary for the plaintiff to show fraud,

24

bad faith, deliberate or knowing acts of deception, or actual deception, but plaintiff must show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." Gress v. Rowboat Co., 190 N.C. App. 773, 776, 661 S.E.2d 278, 281 (2008) (cleaned up); see Overstreet v. Brookland, Inc., 52 N.C. App. 444, 452–53, 279 S.E.2d 1, 7 (1981). Moreover, a "mere breach of contract, even if intentional, is not an unfair or deceptive act." Waddell v. U.S. Bank Nat'l Ass'n, 395 F. Supp. 3d 676, 684 (E.D.N.C. 2019) (collecting cases); see Respess v. Crop Prod. Servs., Inc., No. 4:15-CV-176, 2016 WL 3821163, at *5 (E.D.N.C. July 13, 2016) (unpublished); Mitchell v. Linville, 148 N.C. App. 71, 75, 557 S.E.2d 620, 623–24 (2001).

To state a claim based on alleged misrepresentations, a plaintiff must plausibly allege "reliance on the misrepresentation in order to show the necessary proximate cause." Bumpers v. Cmty. Bank of N. Va., 367 N.C. 81, 88–89, 747 S.E.2d 220, 226 (2013); see Johnson v. Lendlease (US) Pub. Partnerships LLC, No. 7:21-CV-188-D, 2022 WL 2447091, at *15 (E.D.N.C. July 5, 2022) (unpublished). "Reliance, in turn, demands evidence showing that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." Bumpers, 367 N.C. at 89, 747 S.E.2d at 227 (cleaned up); Rahamankhan Tobacco, 989 F. Supp. 2d at 478. To the extent plaintiffs allege the FCX and TTD defendants were "deceptive[] and/or [made] misrepresentations," this claim sounds in fraud and Rule 9(b)'s heightened pleading requirements apply. See Am. Compl. ¶ 196; Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 731 (M.D.N.C. 2015) ("[T]his court need not decide whether Rule 9(b) governs all section 75–1.1 claims . . . [however,] Rule 9(b) applies to section 75–1.1 claims alleging detrimental reliance on false or deceptive representations.").

Plaintiffs' UDTPA claim fails for similar reasons its fraud claim fails. Plaintiffs fail to plausibly allege the time, place, or content of defendants' alleged misrepresentation and thus fail

to satisfy Rule 9(b)'s heightened pleading standard regarding defendants' alleged misrepresentations. See Fed. R. Civ. P. 9(b). Moreover, plaintiffs fail to plausibly allege detrimental reliance upon defendants' alleged misrepresentation and, likewise, fail to plausibly allege that the plaintiffs suffered an actual injury. See Bumpers, 367 N.C. at 89, 747 S.E.2d at 227; Rahamankhan Tobacco, 989 F. Supp. 2d at 478.

Plaintiffs fail to state a claim under the UDTPA. Thus, the court dismisses count six of the amended complaint.

### G.

In count seven, plaintiffs allege civil conspiracy against all defendants. See Am. Compl. ¶¶ 202–11. Under North Carolina law, a plaintiff may pursue an action for "damages caused by acts committed pursuant to a formed conspiracy." Reid v. Holden, 242 N.C. 408, 414, 88 S.E.2d 125, 130 (1955) (quotation omitted). To state a claim, plaintiff must plausibly allege: "(1) an agreement between two or more persons (2) to do a wrongful act, (3) commission of some overt act by one member of the conspiracy in furtherance of the objectives, and (4) damage to the plaintiff as a result of the actions of the conspirators." Godfredson v. JBC Legal Grp., P.C., 387 F. Supp. 2d 543, 549 (E.D.N.C. 2005) (quotation omitted); see Delk v. ArvinMeritor, Inc., 179 F. Supp. 2d 615, 629 (W.D.N.C. 2002).

Plaintiffs fail to plausibly allege a formed conspiracy. Plaintiffs believe the magic words "upon information and belief" rescue their civil conspiracy claim from Twombly and Iqbal. See, e.g., Am. Compl. ¶¶ 204–06, 208. Indeed, plaintiffs attempt to plead the central elements of a formed conspiracy "upon information and belief," and include the allegation that defendants "were in communication and coordinated the alleged terminations" of their contracts with plaintiffs. See id. at ¶ 204.

Plaintiffs' threadbare allegations do not advance plaintiffs' cause. See Kashdan, 70 F.4th at 701; Mystic Retreat Med Spa & Weight Loss Ctr., 615 F. Supp. 3d at 384–85 (collecting cases); Lemon, 2019 WL 1117911, at *16–17; Carter, 2018 WL 3614975, at *9. Thus, plaintiffs' fail to plausibly allege the existence of a formed conspiracy, and the court dismisses count seven of the amended complaint.

H.

In count eight, plaintiffs allege the FCX and TTD defendants misappropriated plaintiffs' "Mueller Methods and Materials," continue to use and profit from plaintiffs' "Mueller Methods and Materials," and have thereby been unjustly enriched. See Am. Compl. ¶¶ 212–22. In count nine, plaintiffs allege the FCX and TTD defendants misappropriated plaintiffs' "Mueller Methods and Materials," continue to use and profit from plaintiffs' "Mueller Methods and Materials" without an agreement regarding compensation, and have thereby breached the terms of contracts implied at law. See Am. Compl. ¶¶ 223–35.

"When one party confers a benefit upon another which is not required by a contract either express or implied or a legal duty, the recipient thereof is often unjustly enriched and will be required to make restitution therefor." Progressive Am. Ins. v. State Farm Mut. Auto. Ins., 184 N.C. App. 688, 695, 647 S.E.2d 111, 116 (2007) (cleaned up). In evaluating an unjust enrichment claim, "the focus is . . . on the circumstances, if any, which would render it unjust for the owner to keep the benefit of the improvements without compensating the improver." Wright v. Wright, 305 N.C. 345, 353, 289 S.E.2d 347, 352 (1982). Specifically, the unjust-enrichment inquiry focuses on whether the circumstances of the case "give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C. App. 390, 417, 537 S.E.2d 248, 266 (2000). "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party," the benefit must be

"measurable," and "the defendant must have consciously accepted the benefit." Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988); Under North Carolina law, an unjust enrichment claim is "a claim in quasi contract or a contract implied in law." Rev O, Inc. v. Woo, 220 N.C. App. 76, 81 725 S.E.2d 45, 49 (2012). "If there is a contract between the parties, the contract governs the claim and the law will not imply a contract." Booe, 322 N.C. at 570, 369 S.E.2d at 556.

Plaintiffs allege their contracts with the FCX and TTD defendants include "Mueller Methods and Materials." See, e.g., Am. Compl. ¶¶ 91, 95–100. In analyzing plaintiffs' breach claim, the court concluded that the parties' contracts did not obligate the FCX and TTD defendants to maintain the alleged secrecy and confidentiality of plaintiffs' "Mueller Methods and Materials." Nonetheless, plaintiffs have plausibly alleged that plaintiffs' contracts with the FCX and TTD defendants obligated plaintiffs to provide marketing, sales, and distribution advice. See id. at ¶¶ 76–78, 89; [D.E. 74-1]; [D.E. 74-2]; [D.E. 74-3]. Moreover, plaintiffs allege that such marketing, sales, and distribution advice included sharing "Mueller Methods and Materials." See id. at ¶¶ 76–78, 89, 97–100. Thus, in light of plaintiffs' admission, plaintiffs cannot maintain an action for quasi-contract because the express contracts with the FCX and TTD defendants govern. See Booe, 322 N.C. at 570, 369 S.E.2d at 556; Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962) (collecting cases).

Alternatively, even if plaintiffs' "Mueller Methods and Materials" exist beyond the terms of the contracts, plaintiffs' claim fails because the FCX and TTD defendants compensated plaintiffs for their services, which included plaintiffs sharing their "Mueller Methods and Materials." See Am. Compl. ¶¶ 76, 78, 83, 89–90; [D.E. 74-1]; [D.E. 74-2]; [D.E. 74-3]. Cf. Wright, 305 N.C. at 353, 289 S.E.2d at 352; Norman, 140 N.C. App. at 417, 537 S.E.2d at 266.

28

Plaintiffs fail to state claims for unjust enrichment or breach of contracts implied at law. Thus, the court dismisses counts eight and nine of the amended complaint.

## I.

In count ten, plaintiffs allege that the FCX and TTD defendants misappropriated plaintiffs' "Mueller Methods and Materials" in breach of an implied contract that either precluded the FCX and TTD defendants from using plaintiffs' "Mueller Methods and Materials" absent plaintiffs' consent or required the FCX and TTD defendants to compensate plaintiffs for the continued use of plaintiffs' "Mueller Methods and Materials." See Am. Compl. ¶¶ 236–50. Under North Carolina law, a "contract implied in fact arises where the intent of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts." Creech v. Melnik, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998); see Snyder v. Freeman, 300 N.C. 204, 217, 266 S.E.2d 593, 602 (1980). Put differently, "[a]n implied-in-fact contract is an agreement manifested by way of the parties' conduct, not by the expression of any set of spoken words." Kiousis v. Kiousis, 130 N.C. App. 569, 574, 503 S.E.2d 437, 441 (1998). "Such an implied contract is as valid and enforceable as an express contract." Creech, 347 N.C. at 526, 495 S.E.2d at 911. Like an express contract, "[w]hen there have been no meeting of the minds on the essentials of an agreement, no [implied] contract results." Id. 347 N.C. at 527, 495 S.E.2d at 912.

Plaintiffs implied-in-fact contract claim fails for similar reasons as their implied-in-law contract claim. Plaintiffs allege their contracts with the FCX and TTD defendants include "Mueller Methods and Materials." See, e.g., Am. Compl. ¶¶ 91, 95–100. In analyzing plaintiffs' breach claim, the court held that plaintiffs' agreements with the defendants' did not obligate the FCX and TTD defendants to maintain the alleged secrecy and confidentiality of plaintiffs' "Mueller Methods and Materials." Nonetheless, the court held plaintiffs have plausibly alleged that plaintiffs' contracts with the FCX and TTD defendants obligated plaintiffs to provide marketing, sales, and

29

distribution advice. See id. at ¶¶ 76–78, 89; [D.E. 74-1]; [D.E. 74-2]; [D.E. 74-3]. Moreover, plaintiffs allege that such marketing, sales, and distribution advice included sharing "Mueller Methods and Materials." See id. at ¶¶ 76–78, 89, 97–100. Thus, in light of plaintiffs' admission, plaintiffs cannot maintain an action for quasi-contract because the express contracts with the FCX and TTD defendants govern. See Booe, 322 N.C. at 570, 369 S.E.2d at 556; Vetco Concrete, 256 N.C. at 713, 124 S.E.2d at 908 (collecting cases).

Alternatively, plaintiffs fail to plausibly allege that the parties acted with intent to be bound after their contracts expired or were terminated. Thus, plaintiffs have failed to plausibly allege evidence of the FCX and TTD defendants' actions to suggest the existence of an implied-in-fact contract. See Kiousis, 130 N.C. App. at 574, 503 S.E.2d at 441.

Plaintiffs fail to state a claim for breach of a contract implied in fact. Thus, the court dismisses count ten of the amended complaint.

## J.

In count eleven, plaintiffs assert a claim for punitive damages against all defendants. See Am. Compl. ¶¶ 251–58. Punitive damages may only be awarded in cases involving fraud, malice, or willful or wanton conduct. See N.C. Gen. Stat. § 1D–15(a). Punitive damages may not be awarded solely for breach of contract. See id. at § 1D–15(d). Moreover, "a claim for punitive damages is not a stand-alone claim." Funderburk v. JPMorgan Chase Bank, N.A., 241 N.C. App. 415, 425, 775 S.E.2d 1, 8 (2015).

The court has dismissed all of plaintiffs' claims. Thus, the court dismisses count eleven of the amended complaint.

## K.

On August 7, 2024, plaintiffs moved for a preliminary injunction. See [D.E. 42]. Plaintiffs essentially ask the court to enjoin the defendants from conducting any business. See id. at 3–4.

30

The court, however, has dismissed plaintiffs' claims. Thus, plaintiffs have no likelihood of success, and the court denies plaintiffs' motion for a preliminary injunction.

III.

In sum, the court GRANTS defendants' motions to dismiss plaintiffs' amended complaint [D.E. 46, 49, 61], DISMISSES WITH PREJUDICE plaintiffs' amended complaint [D.E. 74], and DENIES plaintiffs' motion for preliminary injunction [D.E. 42]. In dismissing the amended complaint with prejudice, the court notes that plaintiffs amended their complaint, failed to address numerous deficiencies in the amended complaint, and did not ask for yet another opportunity to amend. The clerk SHALL close the case.

SO ORDERED. This 24 day of February, 2025.

JAMES C. DEVER III
United States District Judge